IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

LYNDA HANG VANG and
JOSEPH CARL LUCAS

CRIMINAL
NO. 14-0177

**MEMORANDUM**

**SCHMEHL, J.**                                                                 May 8, 2015

Both defendants in this case, Lynda Hang Vang and Joseph Carl Lucas, have filed motions seeking suppression of evidence uncovered through a search of Lucas's apartment, where they both lived, on December 5, 2012. Based on the facts and conclusions set forth below, the Court will deny the motions.

**Findings of Fact**

1. On August 8, 2012, Officer Keith Stambaugh of the Silver Spring Township Police Department received a complaint from Jesus Quintana. Quintana reported an AK-47 was stolen from his house the day before, and he believed the only person with access was his ex-girlfriend, Shane Sloane, whom he had left at his house alone to get some of her belongings.

2. Quintana also noted that Sloane was involved with a drug dealer named Joe who drove a silver Mustang Cobra.

3. Stambaugh learned the next day that Sloane had been arrested after a witness reported having seen an AK-47 in the trunk of a car belonging to Philip Bell, who shared an apartment with Sloane.

4. Stambaugh at some point learned that Sloane had a criminal record and several aliases and that her mother had kicked her out for stealing. Quintana also noted that he considered Sloane a compulsive liar and a drug user.

5. Stambaugh spoke to Sloane and Bell on August 9, and they initially denied any knowledge of the AK-47.

6. Later that day, however, Sloane contacted Stambaugh and came in for a recorded interview.

7. In that interview, Sloane reported having met Joseph Lucas on sugardaddiesforme.com; she gave Stambaugh the website login information, which he used to pull up the profile, and she identified the photo as Lucas.

8. Sloane noted that Lucas drove or owned a silver Mustang Cobra, a black Acura, and a red and black HHR.

9. She reported that she had gone with Lucas to Room 107 of a Rodeway Inn in the Lancaster area, where he had her snort one of several different drugs he had there (Silver Spring Township, in Cumberland County, is a considerable distance from Akron, which is in Lancaster County and comparatively close to Lancaster city).

10. They then went from the Rodeway Inn to his nearby house, where he showed her some handguns, a knife collection, some synthetic or raspberry marijuana, and a duffel bag with a white narcotic in brick form.

11. Sloane also stated that Lucas's girlfriend, an Asian woman named Lynda, was at the apartment.

12. After returning to the Rodeway Inn, Sloane mentioned Quintana's AK-47 to Lucas, which seemed to interest him.

13. Sloane said that when she was at Quintana's house on August 7, Lucas showed up and made her find and give him the AK-47, along with magazines and ammunition.

14. On August 10, 2012, Sloane's soon-to-be-ex-husband reported to Officer Vassler, also of Silver Spring Township, that he thought Sloane did indeed have the stolen gun that had been reported and that it had something to do with her involvement with a Joe from the Lancaster area. He also noted that Sloane's family had received a call from her at the Akron Rodeway Inn, and the number was for Room 107.

15. Through further investigation, officers from Silver Spring Township and Akron confirmed some details of this story, including: the presence of surveillance cameras at Lucas's apartment; the apartment's proximity to the Rodeway Inn; that Sloane and Lucas had stayed at Room 107 of that motel at the relevant time, with a parking listing for a black Acura; as noted above, that Lucas had a sugardaddiesforme.com account; that there was a black Acura registered to Lucas with an address of 9 North 9th Street in Akron; and that a black Acura was in fact in the driveway at that address.

16. Separately in the summer of 2012, an informant reported to the Lancaster County Drug Task Force that a Joseph Lucas was selling drugs, including something called "kitty," from his apartment at 9 North 9th Street in Akron.

17. Detective Young of that unit tried unsuccessfully to set up a drug purchase from Lucas. He ran a vehicle report that showed a Ford Mustang, a Chrysler HHR, an Acura, and a Saab registered to Lucas.

18. Another informant reported that a 37- to 40-year-old, approximately 5' 8", white male, who lived in Akron and drove a red Chrysler hatchback and whom he knew as Mr. Benson, was selling amphetamines and a drug called "kitty," and was producing synthetic raspberry marijuana. The Lancaster County Drug Task force had not previously heard of a drug going by the slang name "kitty."

19. Both investigations stalled. Sloane was incarcerated and became uncooperative, and at least one of the people talking to the drug task force was also incarcerated and could not be used for a controlled buy.

20. The several law enforcement agencies involved had multiple communications. Early on, Silver Spring Township police called Akron Borough police, giving them Lucas's name and noting that he might be in possession of a stolen AK-47; this report made its way to Akron's Chief Zell.

21. Months later, around November, Chief Zell separately got a call from Detective Vance of the drug task force asking about Lucas. Vance told Zell about the drug task force investigation into Lucas, and Zell told Vance about the possible stolen AK-47 information received from Silver Spring Township.

22. Later, Silver Spring Township police called Akron police again, providing the additional information from Sloane's interview about her trip to the Rodeway Inn and Lucas's apartment in Akron.

23. At this point, Stambaugh learned that Lucas was on parole and contacted the parole office, communicating with Agent Ralph Thomas. Thomas relayed the contact to Lucas's parole officer, Jay Williams.

24. Williams went to talk with Chief Zell, who noted that he had also been contacted regarding Lucas by both Silver Spring Township police and the drug task force.

25. Between the message from Thomas and the conversation with Chief Zell, Williams received Stambaugh's information that Lucas had an AK-47 and other weapons, had surveillance at his apartment, had a locked door inside the apartment, and was making synthetic raspberry marijuana.

26. Williams also learned from Zell that Detective Vance of the drug task force had an interest in Lucas. Williams then heard directly from Vance, who told him only that the drug task force had been investigating Lucas for drug activity.

27. Having been in touch with Stambaugh, Vance obtained a copy of the recording of Sloane's interview. Vance noted several points in common between Sloane's information and the drug task force's investigation into Lucas, specifically: mention of a red vehicle with black rims, which Vance had seen at Lucas's apartment during his own surveillance; reference to a drug called "kitty"; and a description of surveillance cameras at the apartment, which Vance confirmed.

28. Vance also testified that in his experience, such surveillance is common for someone dealing and trafficking narcotics.

29. Based particularly on Williams's testimony, it does not appear that Vance ever told Williams about these links between Sloane's story and his own investigation.

30. Zell had suggested to Williams that, for safety, if he was to search Lucas's apartment, he could first call Lucas in for an appointment at the parole office so he would not be present at the apartment. Williams followed through on that plan, arranging for Lucas to visit his office on December 5, 2012.

31. When he arrived, Williams patted him down and checked his pockets. Williams and another parole agent used the keys they found in Lucas's pocket to search his vehicle, where they found packaging for a "urinator," a device that can be used to produce a drug-free urine sample, which indicated to Williams that Lucas was probably using drugs.

32. Williams and other parole agents went to Lucas's apartment, entered using the keys they had taken from him, and made a preliminary check of the apartment looking for anyone hiding in any of the rooms.

33. Defendant Lynda Vang, who was Lucas's girlfriend and also lived at his apartment, arrived following that opening phase of the search.

34. The parole agents identified themselves, told her they were there to search the apartment, and asked for her consent to conduct the search, which she gave.

35. They asked her if there were any weapons in the apartment, and she told them she had a .22-caliber pistol in the top dresser drawer in the master bedroom.

36. The search uncovered a .380-caliber pistol in that location.

37. English is not Vang's first language, and Williams was able to tell that her English was somewhat broken. Vang has not required an interpreter in court.

38. The agents proceeded with the search, which—during both parole's initial search and a further search by the drug task force subject to a warrant based on parole's initial discoveries—ultimately revealed drugs and weapons throughout the apartment in locations both obvious and less so. That evidence is the subject of this motion.

**Discussion**

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). The government's burden carries a preponderance of the evidence standard. *United States v. Fautz*, 812 F. Supp. 2d 570, 609 (D.N.J. 2011) (citing *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)).

The first major focus of defendants' arguments and cross-examinations at the hearing is the idea that the search was impermissible because the parole agents acted as stalking horses for the police. But the Third Circuit has ruled the stalking horse argument unavailable to invalidate searches. *See United States v. Williams*, 417 F.3d 373, 377-78 (3d Cir. 2005) (citing *United States v. Knights*, 534 U.S. 112 (2001)); *see also United States v. Crews*, 494 F. App'x 240, 244 (3d Cir. 2012) ("we have rejected the notion that such 'stalking horse' claims are a valid basis to challenge a probation officer's search"). Given this clear precedent, the stalking horse argument does not establish a basis for defendants' motions.

A preliminary basis for the motions does exist, however, because the initial search was conducted without a warrant (and the latter portion of the search was conducted with a warrant obtained on the basis of evidence found during the initial search). "In the case of parolees, however, the requisite level of suspicion is reduced and a warrant is not required." *United States v. Baker*, 221 F.3d 438, 443 (3d Cir. 2000), as amended (Sept. 21, 2000). The totality of the circumstances, including the likelihood that parolees and probationers will violate the law or conditions of their release, means that only reasonable suspicion is required. *See Knights*, 534 U.S. at 118-21.

Reasonable suspicion is a lower threshold than probable cause, requiring a particularized and objective basis for suspicion under the totality of the circumstances, crediting officers' experience and training. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Further, "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Under the totality of the circumstances in this case, Williams and the other parole agents had reasonable suspicion to support the search in question. A few points argued by the defendants do fall in their favor. The Court has not found that the parole agents had a valid basis for the idea that there may have been explosives in the apartment; the evidence is insufficient to determine where that idea originated, and it cannot be relied upon to support reasonable suspicion. Likewise, as noted above, the Court cannot find

that Williams knew of the corroborating matches between Sloane's story and Detective Vance's drug task force investigation. What Williams did legitimately know in developing reasonable suspicion was that Silver Spring Township suspected Lucas of being in possession of an AK-47 and had a witness who had stated that Lucas had other guns, knives, and multiple specific types of drugs in his apartment, which had surveillance cameras and a locked inner door. He also knew that Lucas was under investigation by the drug task force. The fact that much of the information came from a witness (Sloane) whose credibility had been called into question does not undermine the reasonable suspicion. Even absent Detective Vance's corroboration, the Silver Spring Township and Akron officers confirmed some details of Sloane's story, and as noted above, case law provides that reasonable suspicion may be based on less reliable information than probable cause. Neither does the lapse of time between the events related by Sloane and the eventual search prevent a finding of reasonable suspicion. Parole officers are tasked with supervising and investigating their parolees in the context of the basic assumption that parolees have an elevated likelihood of violation. The clear violations indicated by Sloane's story and even the simple fact that the drug task force had some basis for an investigation point to serious, systematic, and extensive enough activity to make Williams, Defendant's parole agent, reasonably suspicious that such violations were ongoing.

Defendant Vang's supplemental brief following the hearing raises cursory arguments regarding her possible consent to the search. She notes that she had not signed a "home provider form," did not sign a consent to search form, and may have limited understanding of English, and further that she could not have consented because some

testimony suggests the search happened before anyone spoke to her. It is not clear if these points are made merely to forestall an argument by the government that Vang's consent legitimized the search if the Court found it invalid because of stalking horse or reasonable suspicion problems; if so, the consent point need hardly be addressed. It is possible, however, that Vang is arguing that her lack of consent voids the search with respect to her *despite* the presence of reasonable suspicion and the lack of a stalking horse problem, in other words, that even though there was sufficient basis for the search of Lucas because of his parole status, the search violated Vang's rights separately and the evidence cannot be used against her.

To the extent a search is predicated on consent, "[t]he government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989). Voluntariness is based on the totality of the circumstances, including factors regarding the consenting individual's ability to understand. *See id.* at 1081-82 (noting, among other factors, youth, lack of education, and low intelligence). Language-barrier issues may be relevant to the voluntariness of consent in some circumstances. *See, e.g.*, *United States v. Vidal-Pina*, No. CRIM.07-854 (KSH), 2008 WL 4326789, at *11 (D.N.J. Sept. 22, 2008); *United States v. Kikumura*, 698 F. Supp. 546, 560 (D.N.J. 1988).

But consent is really not the issue. What little law can be found on the topic suggests that the reduced requirement for searching parolees also limits the search protections of others that live with them. *See Shea v. Smith*, 966 F.2d 127, 130-34 (3d Cir. 1992). In *Shea*, the plaintiff sued for violation of her Fourth Amendment rights when probation personnel entered her home after receiving information that her boyfriend, who

resided there at least half the time, had violated the terms of his probation. *Id.* The court made no mention or distinction regarding the separate rights of the non-probationer or her separate areas of the home, despite the fact that the case squarely focused on her rights and the search included entering her bedroom while she was sleeping and possibly also searching her closet. *See id.* at 129; *see also United States v. Woods*, 149 F. App'x 104, 107 (3d Cir. 2005) (affirming a conviction based on drug evidence found in a barn on the defendant's property because the officers were lawfully searching the property for a third party who was in violation of his probation). This is essentially an application of the plain view exception, because the parole officers were lawfully present throughout the apartment with access to the obviously incriminating objects—drugs and guns—pursuant to reasonable suspicion that Lucas had drugs and guns in the apartment; therefore, the finding and seizure of the evidence was lawful. *See United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).

It is possible, given that Vang herself was not on parole and had not signed a home provider agreement, that she "could have refused consent to a search of areas of the residence which were not common to" herself and Lucas. *See Lombardo v. Tokar*, No. CIV.A. 3:11-1895, 2014 WL 6696276, at *5 (M.D. Pa. Nov. 26, 2014). But Vang would have had to expressly refuse consent. *See id.* In *Georgia v. Randolph*, 547 U.S. 103, 109-23 (2006), police performed a search based on a wife's consent despite the husband/cotenant's refusal to consent; the search revealed evidence against the husband, and the Supreme Court ruled the search invalid as to him. The *Lombardo* opinion brings the holding of *Randolph* into the context of a search carried out pursuant to parole-related reasonable suspicion. It is not clear that the consent-related logic of common and separate

11

areas actually applies to parole-related searches, though; as noted above, such searches are not based on consent but on reasonable suspicion and the nature of parole. Allowing refusal of consent by a cotenant in the parole context (as opposed to a search based on a cotenant's consent as in *Randolph*) would often give parolees, who have a recognized likelihood of committing violations, convenient hiding places within their own homes. Clearly, this cannot be permitted. There are few cases involving the search protections of a third party in whose home a parolee or probationer lives, and there appear to be no cases featuring the reverse scenario at issue here, where a third party appears to be living in a parolee or probationer's home. In any event, the Court finds both that Vang did not expressly refuse consent and also that the initial search did not invade any areas to which Lucas did not have at least common privilege (the apartment was primarily Lucas's, and the only evidence relevant to the question of possible separate areas within the apartment suggests the defendants shared it fully, including the master bedroom). Alternatively, the Court finds that Vang did consent. Her indeterminate language issues do not preclude consent, especially given that she has not required an interpreter in court, and Agent Williams's testimony that he requested and received Vang's consent was clear and credible. Though Vang argues that Chief Zell's testimony indicated no one spoke to her before the search and she was kept alone in the kitchen while the search proceeded, even Chief Zell testified that it was in fact someone from parole that first encountered Vang and brought her up the stairs before she was sequestered in the kitchen.

**<u>Conclusions of Law</u>**

1. Because the stalking horse challenge is unavailable, the search on December 5, 2012, is not invalidated by any cooperation between the parole agents and police.

2. Defendant's parole officer had information—that Lucas was under investigation by the drug task force and that a witness statement and some independent investigation had led Silver Spring Township police to believe Lucas had kept at his apartment a stolen AK-47 and other guns, a knife collection, several different types of drugs, a locked interior door, and video surveillance equipment—providing him with reasonable suspicion that Lucas was in violation of the law and his parole terms, and that evidence of such violation could be found at his apartment.

3. The search was not separately invalid with respect to Vang. The parole officers searched the apartment lawfully pursuant to reasonable suspicion of a parolee and uncovered evidence that also implicated Vang. Her consent was not required. In any event, she did not refuse consent and in fact consented.